IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

**STATE OF TENNESSEE v. KARLUS MONTREZZ BRANCH**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-C-1375    Angelita Blackshear Dalton, Judge**

_____

**No. M2018-01913-CCA-R3-CD**

_____

A Davidson County Grand Jury indicted the Defendant-Appellant, Karlus Montrezz Branch, with first-degree premeditated murder, and he was later convicted of the lesser included offense of second-degree murder.[1] The Defendant received an effective sentence of twenty-nine years imprisonment. In this appeal as of right, the Defendant raises the following issues for our review:  (1) whether the evidence is sufficient as a matter of law to support the Defendant's conviction for second degree murder, and (2) whether the Defendant is entitled to plain error review of the trial court's admissions of statements made by Tierra Braden as excited utterances, and whether these admissions violated the Confrontation Clause.  Upon our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

David A. Collins, Nashville, Tennessee, for the Defendant-Appellant, Karlus M. Branch.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Addie Askew, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

On May 9, 2016, the Defendant, Karlus M. Branch, shot and killed the victim, Ronnie Foxx, after confronting him about a rumor that the victim had been in a fight with the Defendant's sister.  At trial, the Defendant claimed that he shot the victim in self-defense because he thought he saw the victim reaching for a weapon.  The victim's

_____

[1] The Defendant was also charged and convicted of two counts of felony reckless endangerment, which are not contested in this appeal.

mother, Vickey Foxx, testified that at the time of the victim's death, he was twenty-years old and had a three-year-old son named RJ. Several eyewitnesses to the fatal shooting provided the bulk of the testimony at the Defendant's May 21-24, 2018 trial, which we will summarize below.

Prior to the offense, Keyera Braden, the victim's girlfriend and the mother of his three-year-old son, had been in a dispute on social media with some girls. Keyera knew the Defendant, who had the nicknames "Tree-Los" and "Willa", because her sister, Tierra Braden,[2] had dated the Defendant on and off "for a long time." The young couples had spent a lot of time together. On the day of the offense, Keyera learned from the Defendant's sister, Alexis Christian, that the Defendant's cousin, Lucy Owens, wanted to fight her. Keyera dropped off her son at her grandmother's house and went to a park with the victim, Shermond Dillard, and Jerica Taylor. Keyera's sister, Tierra, was already at the park when they arrived. Keyera and Lucy Owens fought at the park. Neither the victim nor Alexis Christian were involved in the fight. The Defendant was not present at the park when this fight occurred.

After the fight, Keyera returned to her apartment with her son, the victim, Tierra, Dillard, and Taylor. As she got out of her car and approached her apartment, she saw the Defendant "walking down the sidewalk with his hand in his pocket." She said the Defendant was wearing a red hoodie with the hood up and his head down. Keyera testified as to the events that occurred between the victim and the Defendant as follows:

> [The Defendant] walked up and he said, "Did you put your hand on my sister[?]" And I said, I spoke up, I said, "He didn't put his hand on your sister, what ya talking about[?]" And then [the victim] put his hand around him and said, "Naw Tree, come on, let's walk off." They was fixin to walk off and the next thing you know I heard gunshots and [the victim] fell.

Keyera testified that the victim did not threaten the Defendant, was not acting aggressively, and did not have a gun on him. The victim was holding Keyera's keys and his phone in his hands when he was shot. After the Defendant shot the victim, he took off running in the other direction. Keyera was "standing very close to [the victim]" when the Defendant shot him, and she was afraid for her son's safety because he was "in the middle" of them. Keyera described where everyone was standing on that day based on photographs admitted into evidence by the State. She also said that she lived in the same apartment complex as Anthony Connor, known to her as "CJ", who lived in the apartment directly below hers. On cross examination, Keyera stated that she never saw

---

[2] For clarity, we will refer to Keyera Braden and Tierra Braden by their first names. We mean no disrespect.

- 2 -

the Defendant with a gun in his hand, and she did not remember telling a detective that she did so. Although she did not see the victim with a gun that day, she agreed that he had carried a gun "years before."

Jerica Taylor testified consistently with the testimony of Keyera. She confirmed that she went to the park with Keyera on the day of the offense and that she observed the fight between Keyera and Lucy Owens. The victim was not involved in the fight, and he did not hit the Defendant's sister, Alexis Christian. After the fight, Taylor rode back to South 7th Street with the victim, Keyera, Tierra, her son, and Dillard. She walked towards the apartment with the victim, Keyera, her son, and Tierra, while Dillard stayed at the car. Taylor saw the Defendant walking from "under the steps" of Keyera's apartment. She described the events between the victim and the Defendant as follows:

> [The Defendant] was walking up and we was walking towards him and Keyera and Tierra was kind of still yelling I guess they was kind of still mad and he said, he was talking to little--he looked at [the victim] and he said "Did you hit my sister" and [the victim] said, "no[,]" and he said let me talk, he said, no, let me talk to you and as he was going to put his hand. . . kind of like around his shoulder he pulled a gun out and he shot him.

Taylor said the victim was acting "in a brotherly way" towards the Defendant, and that the entire exchange lasted "not even two minutes." She said that the victim "didn't get his arm all the way around [the Defendant's] shoulder before [the Defendant] pulled the gun out and shot him." She did not see a gun in the victim's hands. After hearing three shots, "[Taylor] ran up the steps because [she] thought [the Defendant] was going to keep shooting[.]" She said she was going to jump over the balcony, but she noticed the shots stopped. She grabbed Keyera's son and took him to the neighbor's house. She confirmed that she saw the Defendant firing the shots and that she saw him with the gun.

On cross-examination, Taylor confirmed that she provided an interview with Detective Holt regarding the events at the park from earlier that day. She believed the victim had a weapon at that time because he asked her if he should "clear it out[.]" She explained that "clear it out," means "when you shoot in the air. . . and everybody just runs[.]" She said that the victim did not actually do so.

Ronisha Brown, the victim's cousin, testified that, on the day of the offense, she saw the victim from across the street with Keyera, her son, Dillard, and Taylor. She then observed the Defendant come from "in the breeze way" and approach the victim. She "was a little bit behind but…as [she] got right there [the Defendant] was already letting off shots, about two shots." She did not hear the victim say anything to the Defendant or act aggressively before the Defendant shot him. She also did not see the victim with a

- 3 -

gun that day. She said the Defendant "took off running" after he shot the victim. She stated that Keyera and her son were standing "right there by [the victim]" when the Defendant shot him. On cross examination, Brown said that she did not hear anything that was said prior to the shooting.

Anthony Connor testified that he could not remember where he was on the day of the offense, and he did not remember giving a statement to the police about the shooting. Out of the presence of the jury, the State played excerpts from two recorded statements Connor provided to Detective Holt on May 10, 2016, and May 23, 2016, in an attempt to refresh his recollection, neither of which was successful. Pursuant to Tennessee Rule of Evidence 803(26), the State then sought to introduce Connor's statements at trial as prior inconsistent statements, which, following certain redactions, was unopposed by the Defendant. Excerpts from Connor's statements that he gave to Detective Holt on May 10, 2016, and May 23, 2016, were then played for the jury and admitted as exhibits. The State also published for identification only the photographic line-up from Connor's second interview, showing that he identified the Defendant as the individual who shot the victim on the day of the offense.

In the first statement, Connor told Detective Holt that the Defendant shot the victim "three or four times" and ran off. Connor knew the Defendant and his family members prior to the shooting, and he believed the Defendant was wearing a red hoodie and shorts. Connor heard "Keyera's sister arguing with somebody so [he] came outside trying to make sure they [were not] on [his porch]." He stated that he saw the "muzzle flash" as soon as he stepped outside on his porch. Although Connor could not see who was shooting because there was a tree blocking his view, he saw the muzzle flash and the Defendant with a gun. Connor called 911 as he observed the Defendant run down the street. He described the Defendant, whom he had known for over a year. He saw the Defendant and the victim together every day. He said the victim was not aggressive and did not have a gun. He said he had "no doubt at all" that the Defendant was the person who shot the victim. In the second statement, Connor identified the Defendant from a photographic line-up. After listening to the excerpts of his statements, Connor explained that "[he] was high more than likely" when he spoke to Detective Holt, he was unable to remember any details from that time, and had since gotten sober. On cross-examination, Connor agreed he had a criminal history consisting of aggravated assault and attempted possession of cocaine for resale.

Out of the presence of the jury, defense counsel advised the trial court that the State intended to introduce statements made by Tierra Braden, an unavailable witness, through Officer Ryan Howard, which he argued were inadmissible based on Crawford v. Washington, 541 U.S. 26 (2004). In a hearing on this issue, Officer Howard testified that the statements at issue were made at the crime scene after the Defendant shot the

victim. In the first statement, Tierra approached Officer Howard's vehicle "yelling that her boyfriend Karlus Branch had shot Ronnie Foxx." In response to Officer Howard asking "why" or "what happened," Tierra told Officer Howard the following:

> She said there was a previous incident I guess at the McFerrin Park where she was with [the Defendant's sister]. I guess some kind of altercation occurred there and I guess [the Defendant's sister] from what [Tierra] said had told [the Defendant] that [the victim] had assault[ed] [the Defendant's sister], which [Tierra] said didn't happen.

> She said they came back to the James Cayce Homes and they parked near 600 South 7th Street and started walking towards 623 South 7th. She said as they are walking she saw [the Defendant and his sister] walking towards . . . as they, I guess, got close to each other, she said that [the Defendant] asked [the victim] did you beat up my sister after that she said [the Defendant] fired two to three shots at [the victim].

Defense counsel conceded that the first statement was admissible through Officer Howard as an excited utterance exception to the rule against hearsay. Defense counsel objected to the remainder of Tierra's statement to Officer Howard as inadmissible hearsay. Following argument of counsel, the trial court engaged in an extensive analysis of the Crawford factors and determined that the remainder of Tierra's statement was admissible through the testimony of Officer Howard. Officer Ryan Howard testified at trial consistently with the testimony he provided during the jury out hearing. On cross-examination, Officer Howard agreed that there was a large crowd gathered around the victim when he arrived.

Demetrius Gabriel, who lived in the same apartment complex as Connor and Keyera, testified that when she came outside on the day of the offense, she heard gun shots "real close" to her. Gabriel stated that Keyera was the "most vocal[,]" but she could not hear the victim or the Defendant saying anything. She did not observe the victim acting aggressively. She said the victim appeared calm, and she did not see him with a gun. She described the Defendant as "a small-framed guy in a hoodie." After the victim collapsed, she screamed for her neighbor. On cross-examination, Gabriel testified that the Defendant and the victim were not aggressive towards each other.

The lead investigator in this case, Detective Jesse Holt, had been given the Defendant's name as a suspect prior to arriving on the scene. He canvassed the area and spoke with several witnesses. He acknowledged that different witnesses told him that they heard a different number of gunshots, which he considered a minor inconsistency in his investigation. Detective Holt reviewed video surveillance footage from the apartment

complex from the day of the shooting, which did not capture the actual shooting, but it did narrow the timeframe of the offense. Detective Holt interviewed Tierra Braden twice and found her statements to be consistent. After speaking with several other witnesses, Detective Holt obtained an arrest warrant for the Defendant. Detective Holt confirmed that he met with Connor on May 23, 2016, to show him a photographic line-up, which was admitted into evidence. Detective Holt said that "without hesitation," Connor identified the Defendant as the person who shot the victim.

Detective Holt spoke with several witnesses from the incident at the park, and he did not obtain any evidence that the victim had hit the Defendant's sister. Detective Holt also recovered the Defendant's primary phone, and the police department completed an extraction report on the phone. He determined from the Defendant's web history that the Defendant searched "Vickey Foxx," the victim's mother, on May 9, 2016, and "Nashville Karlus Branch sought for Monday night's fatal shooting of Ronnie Foxx" on May 14, 2016.

Detective Holt confirmed that the Defendant had the following nicknames: "Tree-Los," "Willa," and "Willa Kain." Detective Holt also reviewed the Defendant's Twitter account as part of his investigation, and the following tweets from the days after the shooting and prior to the Defendant's arrest were admitted into evidence:

> "It is going to be a lot of people dead before this foolishness stops. FRFR,"

> "Gave her my trust and I learned from it,"

> "Gave that hoe a lil Ruger,"

> "That same Ho I used to love ratted on me for real, for real,"

> "Ain't no shooters in the car with me, just this big ole Ruger in the car with me,"

> "I woke up feeling like a boss,"

> "Yeah. I got it on me and I shoot it,"

> "Turned my trap name Willa into a murder name,"

> "Burner on my lap, ain't nobody on my passenger side,"

"I am ready whenever, wherever, it's going to go down,"

"McFerrin looking lovely right now," and

"I knew better than to trust a bitch. I fucked around and fell in love."

Detective Holt reiterated that he did not receive any information that the victim was acting aggressively towards the Defendant or that the Defendant acted in self-defense. On cross-examination, Detective Holt was pressed by defense counsel concerning his prior testimony that all of the witness he interviewed provided consistent statements concerning the shooting. Specifically, Detective Holt acknowledged that, when asked, "Did you see the gun at all[,]" Tierra Braden answered, "No, I didn't see the gun--I didn't see the gun, but I know you can just tell when somebody has a gun like he was walking, holding his side and I just heard pow pow and as soon as the pow pow went off he ran." However, Detective Holt said this was a minor inconsistency based on his experience and the totality of the investigation. He admitted that this was a subjective call on his part.

Officer Clinton Schroeder, a police officer with the Metro Nashville Police Department (MNPD), testified that he responded to a "shots fired" call on May 9, 2016 around 8:09 p.m. at 623 South 7th Street. Upon arrival, he observed a chaotic scene and described the victim as "unresponsive for the most part" and "deteriorated to the point of taking slow and shallow breaths." Officer Schroeder spoke with Keyera on the scene, and she gave him the Defendant's name as the suspect. On cross-examination, Officer Schroeder testified that there was a large crowd gathered around the victim when he arrived at the scene.

Sergeant Robert Goodwin of the MNPD responded to the scene and "started trying to render aid [to the victim]…assess[ed] the damage that he had took." As he was looking for wounds on the victim, Officer Goodwin noted that the victim had keys and a phone in his hands. He did not see a gun in the immediate area surrounding the victim, and he did not see anyone leave the crime scene with a gun. Chief Thomas Williams, the district chief of the Nashville Fire Department, also responded to the scene, confirmed that the victim as "unresponsive" with "very cold and clammy skin," and transported the victim to the hospital.

Warren Fleak, a Crime Scene Investigator with the MNPD, testified that he prepared "a rough draft diagram" of the crime scene. He described the items of evidence at the crime scene as follows: two CCI .40 caliber cartridge casings, a set of keys on a key ring, a projectile, a cigarette lighter, and a cell phone. John Terry, another Crime

Scene Investigator with the MNPD, testified regarding a series of photographs taken of the crime scene that were introduced as exhibits. He collected the evidence from the crime scene and photographed the victim's clothing. Detective William Bolan testified that he responded to the hospital and learned that the victim had died. He interviewed Brown, the victim's cousin, at the hospital, gathered the victim's clothes, and attended the autopsy of the victim.

On May 23, 2016, Lieutenant Jason Duncan was a SWAT Team Sergeant and had received notice that the Defendant was staying at a hotel in Murfreesboro. Lieutenant Duncan testified that he responded to the hotel room, knocked on the door, and the Defendant's mother answered. The Defendant came out of the bathroom while they were talking, and he was taken into custody. Lieutenant Duncan located four cell phones in plain view in the hotel room, which were seized as evidence. On cross examination, Lieutenant Duncan testified that he did not recall whose name the hotel room was in or how long they had been staying there. Officer Jonathan Frost testified that he was involved in the search for the Defendant on May 23, 2016. He took possession of the Defendant's cell phones and transported the Defendant back to Davidson County. On cross- examination, Officer Frost testified as to how the police department became aware of the Defendant's location.

Detective James Rummage testified that he took possession of the Defendant's cell phones and assisted Detective Holt in his follow-up investigation. Ryan Kent, the supervisor of the Firearm and Toolmark Identification Unit of the MNPD, testified that he performed an analysis on the cartridge casings, bullets, and bullet fragments recovered in this case. He determined that the two recovered cartridge casings were fired from the same firearm. The results were inconclusive as to whether the two bullets had been fired from the same weapon.

Dr. Emily Dennison, an assistant medical examiner for Davidson County, testified that she performed the autopsy on the victim. She stated that the victim had "one penetrating wound to the right side of the body" and "one perforating gunshot wound to the pelvis[.]" The cause of the victim's death was gunshot wounds, and the manner of death was homicide.

The Defendant claimed he shot the victim in self-defense and testified, in relevant part, as follows:

> Shea. She walked up to me and said that your sister has been looking for you and that is when I was, like, what they looking for me for and she was like they said [the victim] pushed one of them or something

like that, so as she told me that I said, okay, and then I was going back to get my phone off the charger, but as I was going to get my phone I saw TT and them, [the victim] and them coming up the sidewalk, so I said--

. . .

So when I seen Tierra and them coming up the sidewalk I like forget my phone and then I walked towards them so as I was walking towards him, I started off walking towards them--so as I was walking towards them I was walking up and as I like approached them and Tierra asked me so you been staying with Lucy, but I didn't pay her no attention, so I asked [the victim], I asked [the victim] did you hit my sister and then when I asked him and he stated, no, that he did not hit my sister then that is when Keyera shot off like, Bitch, I hate your sister and I would do it again and all of that type. She was just being aggressive and after that I guess [the victim] thought that I was about to do something to Keyera so as I guess as he thought that he reached into his pocket he like tried to grab me, like, he tried to grab me, and when he tried to grab me I ducked and pushed off and shot, and shot through my hoodie pocket…out of fear. I was scared. I didn't know what he was trying to do.

The Defendant demonstrated how he interacted with the victim. He said he had seen the victim grab other people in the same way before "when he was robbing people and stuff like that." He said that when the victim grabbed someone like that, "Somebody done get shot." He believed that was about to happen to him.

The Defendant did not wait for the police to arrive because he was scared. He had known the victim since their freshman year of high school, and they engaged in criminal activity together. He said they "did all type of stuff…like, anything involving guns[,]" and that the victim always carried a gun. The Defendant maintained that he never threatened anyone about testifying at his trial. He stated that he did not mention that he acted in self-defense to Detective Holt because he "didn't think that he was going to believe [him][,]" and he did not trust the police. He said the tweets that the State introduced were song lyrics, which he chose because of what he was going through. He was not trying to kill the victim when he shot his gun, but he admitted that he was "firing recklessly." He said, "I felt like my life was in danger at that moment, so at that moment it was like didn't nothing matter, it was either you or me."

Following a Rule 404(b) hearing, the trial court determined that the Defendant's prior bad acts of attempted robbery and two counts of aggravated assault were admissible to rebut the Defendant's statement that he was scared and acting in self-defense. On

cross- examination, the Defendant agreed that he was at the subject apartment complex on the offense date with a loaded gun in his pocket. However, he disagreed with the testimony of the State's witnesses, and asserted that he only saw the victim, RJ, Tierra, and Keyera when he approached. He stated that Keyera started acting aggressively, and the victim reached for Keyera and then "reached for his gun and tried to grab [him]."

The Defendant was insistent that the victim had a gun on him. Confronted with the testimony of the State's witnesses who said the victim did not have a gun, the Defendant replied, "All 20 witnesses wasn't there on the scene." He saw the print of the gun in the victim's pocket and did not realize that he had shot the victim. He ran away after shooting the victim because he was "scared," "shocked," and "wasn't intentionally trying to shoot him." The Defendant disposed of the hoodie that he was wearing when he shot the victim as well as the gun he used.

The Defendant initially denied that he had threatened Shermond Dillard not to testify in his case, but he later agreed that he had threatened Dillard previously, "Because we was in jail and he was sending kites and all type of stuff telling people when I see him I'm going to do this to him and all this and that[.]" A letter that the Defendant wrote, which said, "I'm fucked up in the head, fr thug all I think about is murder and money[,]" and "Man check [sic] dat Shermond n---a for me lil bruh ask 'em do he love life[,]" was entered into evidence. The Defendant testified that he lied to Detective Holt during his interview because he "didn't trust him[,]" and that he did not think he was going to believe him. Finally, the Defendant admitted that he had previously pled guilty to attempted robbery and two counts of aggravated assault.

Based on the above proof, the jury convicted the Defendant of the lesser included offense of second degree murder and two counts of felony reckless endangerment. On August 9, 2018, the trial court conducted a sentencing hearing during which the presentence report was admitted into evidence and showed that the Defendant had been on bond when he committed the instant offense. The trial court subsequently sentenced the Defendant, as a Range I, standard offender, to a consecutive term of twenty-five years for second degree murder and two years for each count of felony reckless endangerment. The trial court further ordered these sentences to be served consecutively to another case, for a total effective sentence of twenty-nine years.

As previously discussed, the Defendant did not file a motion for new trial. The Defendant filed a notice of appeal, and upon motion, this court waived the thirty day filing deadline. This case is now properly before this court.

**ANALYSIS**

**I.  Sufficiency of the Evidence.**  The Defendant argues that the evidence is insufficient to support his conviction of second degree murder based on the inconsistent testimony of the State's witnesses.  The State responds that the jury heard this evidence and resolved any conflicts in the testimony in favor of the State.  We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).  "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.  Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).  When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury."  Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

In this case, the Defendant was convicted of second degree murder.  Second degree murder is "a knowing killing of another." Tenn. Code. Ann. § 39-13-210(a)(1). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to

circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id.

At trial, the Defendant claimed that he acted in self-defense. Tennessee Code Annotated section 39-11-611(b), which was in effect at the time of the offense, states, in pertinent part:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where such person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611 (Supp. 2008) (amended 2009, 2012, 2016). "The State carries the burden of proving that the defendant did not act in self-defense." State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001) (citing State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim App. 1996)). The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). It is within the jury's prerogative to reject a claim of self-defense. Id.

The Defendant's sole argument on appeal is that the testimony provided by the State's witnesses was inconsistent. He further claims that even though each eyewitness to the shooting testified that the victim did not have a gun on him at the time of the offense, each witness lost sight of the Defendant at some point. He insists, as he did at

- 12 -

trial, that the victim had a gun on him based on the "clear them out" comment at the park earlier that day and that someone could have removed a gun from the victim's body after he was shot. However, this theory was presented to and rejected by the jury, as was its prerogative. State v. Thompson, 36 S.W.3d 102, 107 (Tenn. Crim. App. 2000); State v. Stephens, 264 S.W.3d 719, 740 (Tenn. Crim. App. 2007). Viewing the evidence in the light most favorable to the State, the Defendant approached the victim, who was walking to his apartment with his girlfriend, Keyera Braden, his son, RJ, and his friends. The Defendant confronted the victim about a rumor that he had heard about the victim hitting the Defendant's sister, which was false. The victim put his arm around the Defendant in a brotherly way. Moments later, the Defendant fatally shot the victim. Although the Defendant claimed that he shot the victim in self-defense, the victim was neither acting aggressively towards the Defendant nor carrying a gun. Based on the above proof, any rational trier of fact could have found that the Defendant knowingly killed the victim beyond a reasonable doubt. He is not entitled to relief.

  **II. Admissibility of Statement.** Next, the Defendant contends that the trial court erred in admitting the statements of Tierra Braden through the testimony of Officer Ryan Howard. Specifically, he argues that these statements were hearsay and admitted in violation of Crawford v. Washington, 541 U.S. 26 (2004). The Defendant acknowledges that he did not file a motion for new trial in this case. See Tenn. R. App. P. 3(e) ("in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . during the trial of the case, or other ground upon which new trial is sought, unless the same was specifically stated in a motion for new trial, otherwise such issues will be treated as waived."); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989) (in the absence of a timely motion for a new trial, the appellate court could only consider the issue addressing the sufficiency of the evidence). Failure to file a motion for new trial results in the waiver of all appellate issues that would result in the grant of a new trial. Id. It is unclear on this record why neither a motion for new trial nor a petition for post-conviction relief based on counsel's failure to do so was not filed. State v. Michael L. Caudle, No. M2018-01471-CCA-R3-CD, 2019 WL 5883678, at *3 (Tenn. Crim. App. Nov. 12, 2019) ("Where counsel fails to file a timely motion for new trial, prejudice is presumed but the petitioner still 'must establish that he or she intended to file a motion for new trial and that but for the deficient representation of counsel, a motion for new trial would have been filed raising issues in addition to sufficiency of the evidence.'") (quoting Wallace v. State, 121 S.W. 3d 652, 657-659 (Tenn. 2003)). Under these circumstances, this issue is precluded from plenary appellate review because it should have been raised in a timely filed motion for new trial. We now review for plain error only, which limits relief to when it is "necessary to do substantial justice" and where the error "has affected the substantial rights" of the defendant. Tenn. R. App. P. 36(b).

In order to review an issue under the plain error doctrine, the following prerequisites must be met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "[P]lain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations marks and citations omitted). The defendant bears the burden of persuading an appellate court that the trial court committed plain error and that the error was sufficient magnitude that it likely changed the outcome of the trial. State v. Clayton, 535 S.W.3d 829, 848 (Tenn. 2017). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

We conclude that the Defendant has failed to carry his burden of persuasion in establishing plain error. As an initial matter, the record shows that the trial court thoroughly analyzed the factors as set out in Crawford, 541 U.S. at 68, and determined that Tierra Braden's statements were non-testimonial. In doing so, the trial court found that the declarant was an observer; that she initiated contact with law-enforcement officials, and that it was a "fine line" determination of whether the officer was trying to secure the scene versus conducting a formal investigation. We fail to see, and the Defendant fails to establish, how the trial court erred in this case. State v. Lewis, 235 S.W.3d 136, 143 (Tenn. 2007). The trial court then properly determined that the statements were hearsay but that they were admissible under the excited utterance exception. More importantly to our analysis, we are compelled to note that the exact testimony about which the Defendant complains, i.e. that he shot the victim two or three times at the time of the offense, was properly admitted by four other witnesses during trial. Although the Defendant disagreed with the witnesses as to his claim of self-defense, the Defendant testified and did not dispute that he fatally shot the victim. Accordingly, even if the trial court erred in admitting Tierra Braden's statement through Officer Ryan, it would not have changed the outcome of the Defendant's trial. Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerly, 838 F.2d 932 (7th Cir. 1988) ("[T]here is no miscarriage of justice if the defendant's guilt is so clear that he would certainly have been convicted even if the error had never been committed)). Because the Defendant has failed to establish that a substantial right has been affected or that

consideration of this issue is necessary to do substantial justice, it is unnecessary to review of the remaining plain error factors. The Defendant is not entitled to relief.

## **CONCLUSION**

We affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE